IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                   No. CR 06-782 JB

FRANKIE SUMMERS,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Sealed Sentencing Memorandum and Objections to Presentence Report, filed February 22, 2007 (Doc. 46)("Sentencing Memo"). The Court held a sentencing hearing on March 7, 2007. The primary issues are: (i) whether the Court should apply U.S.S.G. § 2E1.4 or U.S.S.G. § 2A1.5 to the crime of Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire, in violation of 18 U.S.C. § 1958; and (ii) whether the Court should vary from the guideline sentence of 120 months of incarceration and sentence her to time served and to supervised release with home confinement. Because the Court believes that the United States Probation Office ("USPO") properly used U.S.S.G. § 2E1.4 and U.S.S.G. § 2A1.5 to calculate Defendant Frankie Summers' guideline sentence, the Court will overrule her objections to the Pre-sentence Report ("PSR"), but because the parties have negotiated a reasonable sentence, the Court will vary from the guideline sentence and accept the rule 11(c)(1)(C) plea agreement.

**FACTUAL BACKGROUND**

The crime has an unusual factual background.  Summers represents, with considerable force, that she became convinced that her former son-in-law was sexually molesting her young granddaughter.  See Sentencing Memo at 5-6.  While Summers' attempt to hire a hit man to kill cannot be justified under the law, the Court also believes that she never would have gone down the criminal path she did but for her firmly held beliefs and intense desire to protect her granddaughter.

**1.     The Persons Involved in the Case.**

Summers is sixty-three years old.  See PSR at 1, disclosed January 31, 2007.  She has not heretofore been involved with the criminal justice system.  See id. ¶¶ 43, 44, at 12.

Summers is the maternal grandmother of Lily Ann McBride.  See Sentencing Memo at 2. Lily's mother, Susan McBride, is the eldest of Summers' two children.  See id.  At the time of Lily's birth on October 9, 2000, Ms. McBride was separated from her husband, and Lily's father, Mr. McBride.  See id.  Their divorce became final on May 24, 2001.  See id.

Before her employment in New Mexico, Summers worked on her family farm and as a substitute teacher in Kansas.  See PSR ¶ 69, at 18.  In August 2001, she moved from Kansas to Gallup, New Mexico, where her daughter obtained employment as a counselor in the public school system.  See Sentencing Memo at 2.  Summers represents that she joined her daughter to help care for Lily, who was ten months old.  See id.

Summers began work at Gallup Junior High School, and from August 2001 through 2006, worked there as a special-education teacher.  See PSR ¶ 68, at 17.  Summers has distinguished herself as a teacher in the Gallup School system.  See Sentencing Memo, Exhibit F, Letter from the Reverend Donald M. Steele to Court at 1 (dated September 20, 2006)("Steele Letter"); Sentencing

Memo, Exhibit H, Letter from Nicole D. Keptner to Court at 1 (dated February 17, 2007)("Keptner Letter").  She is not only a competent teacher, but has exhibited a concern for the well being of her students.  <u>See</u> Keptner Letter at 1.

Summers purchased a house in Gallup, and her daughter and granddaughter lived with her there.  <u>See</u> Sentencing Memo at 2.  Summers is a member of the Westminister Presbyterian Church, where she teaches in the Sunday School.  <u>See</u> Steele Letter at 1.

Ms. McBride took Lily on periodic trips to Kansas so that Lily could visit with her father.  <u>See</u> Sentencing Memo at 2.  Summers submits that, upon Lily's return to Gallup after an extended visit with Mr. McBride in July 2002, both Ms. McBride and Summers observed troublesome changes in Lily.  <u>See</u> <u>id.</u>  Summers asserts that Lily became disturbed by frequent nightmares and would awaken in the middle of the night with what were described as "night terrors."  <u>See</u> <u>id.</u>

Ms. McBride took Lily to Josephine Olson and Christine Garcia, who were child counselors at Namaste Child Development Center.  <u>See</u> Sentencing Memo, Exhibit A, Report of Christine V. Garcia at 1-2 (dated December 30, 2003).  Both counselors expressed concern that Lily's behavior was not normal for a child her age.  <u>See</u> <u>id.</u>  In the fall of 2002, Ms. McBride initiated proceedings in New Mexico State District Court to modify her and Mr. McBride's divorce decree;  Ms. McBride sought modification to provide for only supervised visits between Lily and Mr. McBride.  <u>See</u> Sentencing Memo at 2.  Summers represents that the state district court rejected this effort.  <u>See</u> <u>id.</u>

In July 2003, Summers and Ms. McBride brought Lily to Wichita, Kansas for a visit with Mr. McBride.  <u>See</u> <u>id.</u> at 3.  When Lily returned from this visit, Summers asserts that Lily said that she had "spit out daddy."  <u>Id.</u>  Ms. McBride took Lily to the Villa Christi Hospital in Wichita for a SANE SART examination.  <u>See</u> <u>id.</u>  The examination was inconclusive, and Lily returned with her mother

to Gallup.  See id.

Summers and Ms. McBride again took Lily to Wichita in December 2003.  See id.  Upon her return from a visit with Mr. McBride on December 24, 2003, Ms. McBride observed a tear in Lily's labia.  See PSR ¶ 25, at 8-9.  The next day, Ms. McBride took Lily to the local hospital.  See Sentencing Memo at 4.  Registered Nurse Kay Gill-Hopple examined Lily and reported that Lily told her: "Something as big as a mountain had been put inside her."  Id. at 3.  Gill-Hopple found a reddened and inflamed hymen in addition to a tear in Lily's labia.  See id.  Lily was immediately taken into custody of the Kansas Child Protective Services.  See id.

A protracted legal proceeding in the Sedgewick County Juvenile Court ensued.  See Sentencing Memo at 3.  The Sedgwick County litigation involved several examinations of Lily and both of her parents, polygraph examinations of each of her parents, and considerable testimony from examiners from both New Mexico and Kansas, as well as criminal investigators in Kansas.  See id. at 3-4.  Lily's counselors from New Mexico testified that they were concerned that Lily had been the victim of sexual abuse.  See id. at 4.  Gill-Hopple, testified that, in her opinion, Lily had been sexually abused.  See id.  Jeanne Erickson conducted a sexual abuse evaluation.  She found that "Lily has more likely than not been sexually molested or raped."  Sentencing Memo, Exhibit C, Report of Jeanne Erikson at 10 (dated April 6, 2004).  The Kansas Child Protective Services found that the allegations of sexual abuse were substantiated.  See Sentencing Memo, Exhibit D, Notice of Department Finding at 1 (dated February 10, 2004).  The Kansas court appeared to accept that the allegations of child abuse were substantiated, but could not determine the abuser's identity.  See Sentencing Memo at 4.

During the course of the repeated evaluations of Lily and her parents, both Mr. and Ms.

McBride submitted to polygraph examinations.  See id.  During the post-examination interview, Mr. McBride admitted that Lily's mouth could have touched his penis while he bathed her.  See Sentencing Memo, Exhibit E, Kansas Bureau of Investigation Report (dated March 29, 2004).  This disturbing admission, however, was not admitted into evidence during the Sedgwick County proceedings.  See Sentencing Memo at 4.

Summers attended all of the Kansas court hearings.  See id.  Her extensive review of the reports and observations of the testimony convinced her that Mr. McBride was sexually abusing her granddaughter.  See id.  During the course of the Kansas proceedings, she became increasingly frustrated with her granddaughter's plight.  See id.

Summers submits that, as her three-year old granddaughter was shuttled among care facilities, it seemed to her that the judicial system was unconcerned with the harm done to her granddaughter or the potential danger of reuniting Lily with Mr. McBride.  See id.  In 2005, she received news that Lily developed a sore in her genital area, and that the sore was identified as Human Papillomavirus ("HPV"), which she understood, can only be transmitted by human sexual conduct.  See id. at 4-5.

Summers was vocal in her distress; she shared her concerns, her perceived unfairness of the Kansas juvenile proceedings, and her fear for her granddaughter's safety, with several individuals. See id. at 5.  Interviews of her colleagues at Gallup Junior High School revealed that Summers had spoken to them about her granddaughter's case and the frustration she felt with the Kansas legal system's failure to acknowledge what she believed was Mr. McBride's role in her granddaughter's tragic circumstances.  See Sentencing Memo, Exhibit I, Letter from Kathleen Mezoff to Court at 1 (dated January 26, 2007)("Mezoff Letter").

In November 2005, Lily was temporarily placed with Mr. McBride.  See Sentencing Memo at 5.  In January 2006, Summers joined other junior high school teachers at a local bar for a Friday afternoon social gathering, and Steve Holland, a friend of one of the teachers, attended.  See id. Summers explained to Holland her anguish of the past two years concerning the legal proceedings surrounding her granddaughter, and Holland suggested that he knew people who could "take care of Mr. McBride."  See id. at 5.

### 2. **The Crime.**

The crime also arose from an unusual set of circumstances.  Investigative reports indicate that Summers expressed to Holland that she was interested in having Mr. McBride killed and that she had $5,000.00 to "deal with this problem."  See PSR ¶¶ 7, 9 at 4.  Holland then contacted a local Federal Bureau of Investigation ("FBI") agent, who arranged for a Colorado-based agent of the Bureau of Alcohol Tobacco and Firearms ("ATF"), acting in an undercover capacity, to contact Summers.  See id. ¶ 10, at 5.

The undercover ATF agent (" the UC") posed as a potential hit man.  See id.  The UC first contacted Summers on January 27, 2006.  See id.  Summers subsequently engaged in several telephone conversations with the UC.  See id. ¶¶ 10-16, at 5-6.  For the next several weeks, they had several  contacts via telephone, most of which the UC initiated  See id.

During these conversations, Summers and the UC discussed killing Mr. McBride.  See id. She advised the UC that she could pay him $2,500.00 up front and that the remainder would be paid following the murder.  See id. ¶ 13, at 5-6.

Summers argues that her recorded conversations with the UC suggest that, although she was interested in the murder of Mr. McBride, she was unwilling to make a substantial down payment to

him or to consummate a contract for his death.  <u>See</u> Sentencing Memo at 6.  Summers submits that

she parried the UC by suggesting that she did not have the necessary funds available, by wanting to

delay any further planning until the Kansas court proceedings were completed, or by failing to speak

to friends who might provide her a loan.  <u>See</u> <u>id.</u>

The recordings of their conversation contain examples of Summers' indecision.

| Summers: | "Well, I'm still up in the air, I don't really know because we don't know why this hearing was postponed, we don't know what it means." |
|---|---|
| Summers: | "[I]f things are starting to go positively our way, I don't think we don't want to do anything. . . .  "We just have to wait awhile and see what this is all about." |

Sentencing Memo at 6 n.1 (quoting February 26, 2006 Call).

| Wood: | "What do you think you could give me up front?" |
|---|---|
| Summers: | "Ahm, where are you, I didn't go ahead and make the phone call to someone else to arrange, but the ahm . . . ." |
| Wood: | "So, if this court thing doesn't come up for another month or two, then we are limbo for a month or two?" |
| Summers: | "Well, yeah." |
| Wood: | "But right now, you want to wait and just see how it plays out before you make a final decision?  Okay, yeah.  Okay.  Yeah.  That's understandable.  Alright, well I'll give you a call closer toward the end of the week and then we'll touch base and see what you're thinking.  Like I said, I'm ready to go, I've kind of been sitting on things seeing what you wanted to do and I've got to make a decision here on some other things." |
| Summers: | "Well, I'm still up in the air, I don't really know because we don't know why this hearing was postponed, we don't know what it means." |

Sentencing Memo at 6 n.1 (quoting February 6, 2006 Call).

In March 2006, Summers mailed Mr. McBride's photograph, address, and personal

information to the UC.  See PSR ¶ 18, at 7.  She also enclosed $100.00 for the UC's travel expenses

to Wichita so that he could conduct surveillance  See id.  The money was returned to Summers for

failure to include a suite number in the address.  See id.  On March 17, 2006, the UC provided

Summers with his office suite number to aid in the delivery.  See id. ¶ 15, at 6.

Despite the UC's persistent efforts to obtain consideration for a contract, the best the UC

could manage was to procure $100.00 from Summers for travel expenses to visit Wichita and "scope

things out."  Id. ¶ 21, at 7.

## PROCEDURAL BACKGROUND

On March 23, 2006, a Criminal Complaint was filed in the United States District Court,

naming Summers and charging her with Use of Interstate Commerce Facilities in the Commission

of Murder-for-Hire, in violation of 18 U.S.C. § 1958 and Solicitation to Commit a Crime of

Violence, in violation of 18 U.S.C. § 373.  See Criminal Complaint, filed March 23, 2006 (Doc. 1)

On April 12, 2006, a federal Grand Jury returned an Indictment, naming Summers and charging her

with Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire, in violation of

18 U.S.C. § 1958.  See Indictment, filed April 12, 2006 (Doc. 8).  The Indictment noted the offense

took place on or between January 1, 2006 and March 22, 2006, in the State and District of New

Mexico, and elsewhere.  See id.

### 1.    Pretrial Supervision.

Summers represents that, since the beginning of this litigation, she has been under the care

of a psychiatrist.  See Sentencing Memo at 10.  She submits that she attends therapy upon the advice

of Pretrial Services to assist her in coping with the stress of the litigation concerning her

granddaughter as well as the stress associated with this case.  See id.  Dr. Davidson-Stroh opines that

-8-

Summers is not an acute danger to herself or others.  <u>See</u> Sentencing Memo, Exhibit G, Letter of Dr. Davidson-Stroh to Court (dated November 18, 2006)("Davidson-Stroh Letter").

### 2.      The Conclusion of the Kansas Proceedings.

Summers represents that the Kansas court ruled that it could not terminate Mr. McBride's parental access to his daughter.  <u>See</u> Sentencing Memo at 3.  Summers submits that the Kansas proceedings were finally concluded in August 2006 when the court awarded custody to Mr. McBride with visitation to Ms. McBride, and prohibited contact between Summers and Lily.  <u>See</u> <u>id.</u>

### 3.      The Plea.

In view of the unusual circumstances of the crime, the prospect of a viable defense, and Summers' history and characteristics, the parties negotiated a settlement that is now before the Court.  <u>See</u> Plea Agreement, filed December 18, 2006 (Doc. 42).   Pursuant to rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties stipulated to a sentence of timed served plus three years of supervised release, with nine months of supervised in-home detention.  <u>See</u> <u>id.</u> at 2-3. In the event the Court rejects the recommended disposition, Summers may withdraw her plea of guilty.  <u>See</u> <u>id.</u>  Summers represents that the supervisory officials at the United States Attorney's Office approved the Plea Agreement.  <u>See</u> Sentencing Memo at 1.

On December 18, 2006, Summers pled guilty to one count of Use of Interstate Commerce Facilities in the Commission of Murder for Hire, contrary to 18 U.S.C. § 1958.  <u>See</u> Plea Agreement at 2.  The PSR calculates Summers' adjusted offense level at 34, her criminal history at I, and the sentencing range at 151-188 months.  <u>See</u> PSR ¶ 78, at 21.  To arrive at a base-offense level, the PSR uses the level for solicitation to commit a crime of violence, <u>see</u> U.S.S.G. § 2A1.5(a), rather than the base-offense level for the use of an interstate facility for murder for hire without the cross reference,

see U.S.S.G. § 2E1.4(a).  See PSR ¶ 35, at 11-12.  In addition, the PSR assesses, pursuant to U.S.S.G. § 2A1.5(b)(1), a 4-point upward adjustment, because the offense involved the offer or request of anything of pecuniary value.  See PSR ¶ 36, at 12.  The PSR also reflects a 3-point downward adjustment to the offense level for Summers' acceptance of responsibility.  See id. ¶ 41, at 12.

On January 23, 2007, the USPO contacted the United States Sentencing Commission in an effort to obtain clarification on the application of § 2E1.4, as this guideline is not commonly applied in the District of New Mexico.  See Addendum to the Pre-Sentence Report at 2 (dated March 2, 2007)("Addendum").  After the USPO informed the Commission of the details surrounding Summers' case, Rusty Burris of the Sentencing Commission agreed that the USPO had applied the guidelines appropriately in the PSR.  See id.  Burris explained that § 2E1.4 has not been amended since 1992, and that § 2A1.5 was amended in 2004, changing the base-offense level from 28 to 32.  See id.  It was his assertion that § 2E1.4 has not been amended since 1992 because it is not commonly applied.  See id.

The parties urge the Court to accept the Plea Agreement and sentence Summers in accordance with its provisions.  See Sentencing Memo at 1.  Summers requests the Court accept the agreement made pursuant to rule 11(c)(1)(C) and sentence her accordingly.  See id.  Summers requests that, if the Court uses the PSR as a basis to sentence her, she be given an opportunity to further brief the two objections raised in her sentencing memorandum.  See id. at 12.

On March 1, 2007, the USPO contacted Assistant United States Attorney Charles Barth, who is also requesting the Court adopt the stipulation pursuant to rule 11(c)(1)(C) and sentence Summers in accordance with its provisions.  See Addendum at 3.  Mr. Barth confirmed the plea was offered

to Summers based on the unusual circumstances of the case.  He stated Summers' motivation for committing the crime was based on her belief that her ex-son-in-law, Mr. McBride, had sexually molested her granddaughter, and that the courts and law enforcement had failed to protect her granddaughter.  See id.  Mr. Barth also stated the plea was offered because the United States had concerns about taking this matter to trial.  See id.  The United States was concerned that the testimony regarding the allegations of sexual abuse against Mr. McBride could prove to be damaging to the United States' case.  See id.

After Summers filed her objections, the USPO submitted an Addendum to the PSR.  See Addendum.  The United States has not submitted any objections to the PSR.  See id. at 1.  The USPO maintains that it appropriately calculated the guideline sentence in the PSR.  See id. at 3.

## 18 U.S.C. § 1958

18 U.S.C. § 1958 defines use of interstate commerce facilities in the commission of murder for hire as the use of any facility of interstate commerce, "with intent that a murder be committed . . . as consideration for the receipt of, or in consideration for a promise or agreement to pay, anything of pecuniary value . . . ."  18 U.S.C. § 1958.  The Court has not been able to imagine a scenario in which one could commit murder for hire without also, at the same time, committing the crime of solicitation to commit murder.  The elements of the latter appear to wholly subsume those of the former.

Many  prosecutions under 18 U.S.C. § 1958 involve acts of warring gangs or drug lords to eliminate competition and efforts of spouses to murder their partners.  See United States v. Robertson, 473 F.3d 1289, 1290 (10th Cir. 2007)(husband); United States v. Chong, 419 F.3d 1076, 1078-79 (9th Cir. 2006)(rival gang leader); United States v. Wicklund, 114 F.3d 151, 152 (10th Cir.

1997)(spouse's former husband); <u>United States v. Ritter</u>, 989 F.2d 318, 320-21 (9th Cir. 1993)(girlfriend's former boyfriend).  The Court has not, however, located a case similar to this one where the underlying motivation of the crime was to protect a small child from suspected sexual abuse.

<u>**U.S.S.G. § 2E1.4(a) AND U.S.S.G. § 2A1**</u>

U.S.S.G. § 1B1.2 is titled "Applicable Guidelines."   U.S.S.G. § 1B1.2(a) provides, in relevant part:

> Determine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment or information of which the defendant was convicted).  However, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two applicable to the stipulated offense.

> Refer to the Statutory Index (Appendix A) to determine the Chapter Two offense guideline, referenced in the Statutory Index for the offense of conviction.  If the offense involved a conspiracy, attempt, or solicitation, refer to § 2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense.  For statutory provisions not listed in the Statutory Index, use the most analogous guideline.

U.S.S.G. § 1B1.2(a).  The Commentary's Application Note 1 states that  this section provides the basic rules for determining the guideline applicable to offense conduct under Chapter Two (Offense Conduct).  <u>See</u> U.S.S.G. § 1B1.2, comment, app. n. 1.  In other words, the court is to use the Chapter Two guideline referenced in the Statutory Index (Appendix A) for the offense of conviction.  Application Note 1 also states that, in the case of a particular statute that proscribes only a single type of conduct, the offense of conviction and the conduct the statute proscribes will coincide, and the Statutory Index will specify only one guideline for that offense of conviction.  <u>See</u> <u>id.</u>

Appendix A is the Guidelines' Statutory Index, and the Introduction states:

This index specifies the offense guideline section(s) in Chapter Two (Offense Conduct) applicable to the statute of conviction.  If more than one guideline section is referenced for the particular statute, use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted.  For the rules governing the determination of the offense guideline section(s) from Chapter Two, and any exceptions to those rules, see § 1B1.2 (Applicable Guidelines).

U.S.S.G., Appendix A, Statutory Index at 519. According to the Statutory Index in Appendix A of

the Guidelines Manual, for violation of 18 U.S.C. § 1958, the corresponding and applicable guideline

is § 2E1.4.  See id. at 531.  Pursuant to § 2E1.4, the base-offense level is: (i) 32; or (ii) the offense

level applicable to the underlying unlawful conduct, whichever is greater.  See U.S.S.G. § 2E1.4.

U.S.S.G. § 2E1.4 is titled "Use of Interstate Commerce Facilities in the Commission of

Murder-For-Hire."  U.S.S.G. § 2E1.4.  Section 2E1.4 provides that the base-offense level will be the

greater of 32 or "the offense level applicable to the underlying unlawful conduct."  Id.  U.S.S.G. §

2A1.5 is titled "Conspiracy or Solicitation to Commit Murder."  U.S.S.G. § 2A1.5.  It has a base-

offense level of 33 and further states: "If the offense involved the offer or the receipt of anything of

pecuniary value for undertaking the murder, increase by 4 levels."  U.S.S.G. § 2A1.5(b)(1).

In United States v. Smith, 232 F.3d 650 (8th Cir. 2000), the United States Court of Appeals

for the Eighth Circuit faced the issue whether to apply the base-offense level of 32 that U.S.S.G. §

2E1.4(a) mandates or whether to cross-reference to the "offense level applicable to the underlying

unlawful conduct."  Id. at 650.  The Eighth Circuit held that the base-offense level of 43 for murder

applied to the defendant's conviction under 18 U.S.C. § 1958, because: "[h]ere, Smith aided an

interstate murder for hire that resulted in murder.  Thus applying the relevant conduct criteria, first

degree murder becomes the underlying unlawful conduct for purposes of § 2E1.4(a)(2), whether or

not that murder was charged as part of the offense." Id. at 651.

In United States v. Wilson, 920 F.2d 1290 (6th Cir. 1990), Wilson, the defendant, attempted to hire a hit man to kill his wife. See id. at 1291. He subsequently pled guilty to six counts of Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire. See id. Wilson was sentenced under § 2E1.4, because application of the offense level for solicitation to commit murder would have yielded a lower offense level. See id. at 1292-93. At that time, the base-offense level for § 2E1.4 was 23. The base-offense level for § 2A2.1 was 20. See id. The United States Court of Appeals for the Sixth Circuit applied the greater of the two and sentenced Wilson under § 2E1.4, level 23. See id. at 1293. These guidelines have since been amended.

## U.S.S.G. § 2A1.5(b)(1)

According to U.S.S.G. § 1B1.1(b), Application Instructions, the court must determine the base-offense level and apply any appropriate specific offense characteristics contained in the relevant guideline. See U.S.S.G. § 1B1.1(b). U.S.S.G. § 2A1.5(b)(1) provides for a 4-level upward adjustment if the offense "included the offer or receipt of anything of pecuniary value for undertaking the murder." U.S.S.G. § 2A1.5(b)(1). The statute defining murder for hire requires, as an essential element, that the murder be committed "as consideration for receipt of, or as consideration for the promise of agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958. It would appear that the adjustment of U.S.S.G. § 2A1.5(b)(1) is therefore always subsumed in the statutory definition of 18 U.S.C. § 1958, and the United States Sentencing Commission accounts for that fact in U.S.S.G. § 2E1.4(a). See U.S.S.G. § 2E1.4(a).

## ANALYSIS

The offense in this case arose from an unusual set of circumstances.  Based on the unusual circumstances, in combination with the prospect of a viable defense and the history and characteristics of Summers, the parties negotiated the Plea Agreement now before the Court.  See Addendum at 3.  While the Plea Agreement calls for a sizeable variance from the guideline sentence, see Plea Agreement at 2-3, the Court believes that, under the unique circumstances of this case, the agreed upon sentence is reasonable and promotes the goals of 18 U.S.C. § 3553(a) better than the guideline sentence.

## I.   THE COURT WILL OVERRULE SUMMERS' OBJECTIONS.

The plea stipulates, pursuant to rule 11(c)(1)(C), a specific sentence.  See Plea Agreement at 2-3.  Nevertheless, to fulfill its task of first accurately determining the guideline sentence, the Court will address Summers' objections to the two guideline calculations appearing in the PSR.

### A.   THE USPO PROPERLY APPLIED U.S.S.G. § 2E1.4 AND U.S.S.G. § 2A1.5.

Summers asserts that the USPO incorrectly applied the Guidelines in this case.  She contends that the Court should apply U.S.S.G. § 2E1.4, and should not apply U.S.S.G. § 2A1.5, pursuant to the cross reference in § 2E1.4.  See Sentencing Memo at 12-14.  Summers states that the cross reference in § 2E1.4 to § 2A1.5 renders § 2E1.4 redundant.  See id. at 12-13.  She asserts that, by applying this cross reference, all 18 U.S.C. § 1958 offenses would cross reference to the solicitation guideline, because it is impossible to commit murder for hire without also committing solicitation. See id. at 13.

Summers contends that she should have an adjusted offense level of 32 and a total offense level, after acceptance of responsibility, of 29.  She argues that, with a criminal history category of

I, her guideline sentencing range should be 87 to 108 months.  See id. at 14.

While Summers is correct in her understanding of the application of § 2E1.4, the fact remains that the plain language of the guidelines dictates the result in this case.  Summers pled guilty to the Use of Interstate Commerce Facilities in the Commission of Murder for Hire, contrary to, and in violation of, 18 U.S.C. § 1958.  See Plea Agreement at 2.  There is no dispute that Appendix A makes § 2E1.4 the appropriate sentencing guideline.  See U.S.S.G., Appendix A, Statutory Index at 531.

U.S.S.G. § 2E1.4 authorizes two alternative base-offense levels.  See U.S.S.G. § 2E1.4.  The Court is instructed to choose the greater of a level 32 or "the offense level applicable to the underlying unlawful conduct."  Id.  Summers' PSR uses this section to cross reference to U.S.S.G. § 2A1.5(a), the guideline for solicitation to commit murder.  See PSR ¶ 35, at11-12.

Based on the information that the parties and the USPO have provided to the Court, the underlying conduct in this case is Solicitation or Conspiracy to Commit Murder.  The applicable guideline for this offense is § 2A1.5.  Pursuant to § 2A1.5(a), the base-offense level for Conspiracy or Solicitation to Commit Murder is 33.  See U.S.S.G. § 2A1.5(a).  Because the offense level applicable to the underlying conduct -- Conspiracy or Solicitation to Commit Murder -- is greater, the USPO appropriately applied it in this case.

The circumstances of this case are similar to those in United States v. Wilson.  Both defendants sought to hire a hit man to have another person killed.  United States v. Wilson suggests that, if the base-offense level under Conspiracy or Solicitation to Commit Murder had, at that time, been greater than 23 -- the base-offense level at that time for Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire -- it would have been applied.  See 920 F.2d at 1292-93.

This case directs the Court to apply the greater of the two offense levels in play: (i) the offense level for Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire; or (ii) the offense level for the underlying conduct (Solicitation or Conspiracy to Commit Murder).  See U.S.S.G. § 2E1.4(a).

U.S.S.G. § 2A1.5(a) assigns a base-offense level of 33.  See U.S.S.G. § 2A1.5(a).  Summers contends that the cross reference in § 2E1.4 was not the Sentencing Commission's intent when it suggested the alternative application of the offense level applicable to "the underlying unlawful conduct."  See Sentencing Memo at 13.  The PSR's cross reference from U.S.S.G. § 2E1.4(a) to § 2A1.5(a) renders the former guideline redundant; by definition, all 18 U.S.C. § 1958 offenses cross reference to the solicitation guideline, because it is impossible to commit murder for hire without also committing solicitation.  Summers contends that it is fair to assume that, if the Sentencing Commission intended such a redundancy, it would have deleted § 2E1.5 and substituted § 2A1.5 for all § 1958 violations.  See Sentencing Memo at 13.  The Commission did not make this deletion and substitution.

Summers contends that, by providing for the cross reference premised on the "underlying unlawful conduct," the Commission intended to provide additional punishment for 18 U.S.C. § 1958 offenses that resulted in an additional crime.  For instance, it sought to punish a § 1958 violation that resulted in murder, see U.S.S.G. § 2A1.4, level 43; assault with intent to commit murder, see U.S.S.G. § 2A2.1(a)(1), level 33; or kidnaping, see U.S.S.G. § 2A4.1, 33 plus adjustments, more severely because of the associated criminal consequences.  Summers contends that these underlying crimes in the cross reference can occur as a result, or in the course, of the commission of murder for hire.  See id.  She argues that the Sentencing Commission did not intend to abrogate a guideline it

did not delete.  See id.  Summers maintains that her base-offense level should be 32 under U.S.S.G. § 2E1.4 and not 33 under § 2A1.5(a).  See id.

Summers correctly recognizes the redundancy in the guidelines.  But her interpretation of the Guidelines would be inconsistent with its plain language.  Because the redundancy appears to be the result of amendments to provisions that are infrequently used, and the resulting applicable guideline is consistent with the amendments' intent to increase the sentence under the circumstances here, the Court will apply the Guidelines as written and not try to come up with an interpretation that eliminates redundancy but is inconsistent with the plain language.

**B.     THE USPO PROPERLY APPLIED § 2A1.5(b)(1).**

Pursuant to § 2A1.5(b)(1), the USPO applied a 4-level increase, as the offense involved the offer or the receipt of anything of pecuniary value in exchange for undertaking the murder.  See U.S.S.G. § 2A1.5(b)(1).  Summers offered to pay the UC $5,000.00, and she sent him $100.00 to "scope things out."  See PSR ¶¶ 16, 18, 21, at 6-7.  Summers does not argue that, if the USPO appropriately applied § 2A1.5, there was no offer or receipt of anything of pecuniary value for the undertaking of the murder.  See Sentencing Memo.

Mr. McBride was not physically harmed as a result of the acts underlying Summers' conviction.  See PSR ¶¶ 30-32, at 10.  But by cross referencing Summers' guideline calculation base-offense level to U.S.S.G. § 2A1.5(a), the PSR also subjects Summers to an adjustment pursuant to that section.  See id. ¶¶ 35-36, at 11-12.  Paragraph 36 of the PSR applies § 2A1.5(b)(1) and adds 4 levels to Summers' base-offense level, resulting in an adjusted offense level of 37.  See PSR ¶¶ 36, 40, at 12.

Summers argues that, because the offer of anything of pecuniary value is an element of the

crime of murder for hire, an adjustment for this offense characteristic is an error.  <u>See</u> Sentencing Memo at 14.  Summers' argument, however, is inconsistent with the plain language of the applicable guideline.  The Court will apply the Guidelines as written and avoid undertaking the task of making the Guidelines perfectly consistent.  That is the task of the United States Sentencing Commission.

Based on this assessment, the Court concludes that the USPO appropriately applied the Guidelines in the PSR.  Summers' adjusted-offense level is 34, and her criminal history category is I.  <u>See</u> PSR ¶¶ 42, 45, at 12, 13.  Pursuant to U.S.S.G. § 5G1.1(a), the guideline imprisonment sentence is 120 months.  <u>See</u> U.S.S.G. § 5G1.1(a).

**II.     THE COURT WILL VARY FROM THE GUIDELINE SENTENCE.**

The unique circumstances of this offense justify the significant variance from the guideline range for which the Plea Agreement calls.  <u>See</u> <u>United States v. Cage</u>, 451 F.3d 585, 594-95 (10th Cir. 2006)(explaining the determination whether a sentence is reasonable depends on the strength of the correlation between the magnitude of the presence of the factors enumerated in 18 U.S.C. § 3553(a) and the extent of the district court's variance from the guideline sentence).  The Court will accept Summers' plea agreement and the sentence therein.  The Court is convinced that the Plea Agreement accommodates the best interests of justice.

**A.     THE NATURE AND CIRCUMSTANCES OF THE OFFENSE DO NOT COUNSEL IN FAVOR OF THE GUIDELINE SENTENCE.**

18 U.S.C. § 3553(a)(1) directs the sentencing court to consider "the nature and circumstances of the offense."  18 U.S.C. § 3553(a)(1).  There is evidence that the nature of Summers' offense was something less than a consummated contract for murder for hire.  The circumstances -- a grandmother driven by desperation over the sexual abuse of her granddaughter -- created a moral

dilemma for Summers.

The innate human desire to protect one's issue motivated this crime. The baser motives of greed, revenge, or sexual deviancy that inform much of the criminal activity the Court sees do not appear to be present here. While Summers committed a crime, its underlying rationale is not as repulsive as it might otherwise be.

**B.     SUMMERS' HISTORY AND CHARACTERISTICS COUNSEL IN FAVOR OF A VARIANCE FROM THE GUIDELINE SENTENCE.**

The exchange represented in the plea is reasonable when the Court considers Summers' history and characteristics. See 18 U.S.C. § 3553(a)(1). Summers represents that she was so naive in criminal matters that she mailed the $100.00 to Wood's business suite without considering whether a hit man would operate from a multiple office building with a suite number. See Sentencing Memo at 10; PSR ¶¶ 16-18, at 6-7. Other than her conversations with the UC over a seven-week period in 2006, there is nothing in Summers sixty-three year history, or current situation, that suggests she will be a further danger to society or to any individual. See PSR.

**C.     THE NEED TO PROTECT THE PUBLIC DOES NOT REQUIRE IMPOSITION OF THE GUIDELINE SENTENCE.**

A sixty-three-year-old school teacher, whose criminal activity stemmed from a scenario unlikely to be repeated, does not represent a danger to the public. See Sentencing Memo, Exhibit I, Letter from Kathleen Mezoff to Court at 1. While the Court can never guarantee the future conduct of someone it sentences, there is no indication that Summers has ever been a threat to anyone in society other than Mr. McBride. See PSR. The Court believes that Summers has learned her lesson and will not engage in future criminal behavior.

### D.   THE COURT DOES NOT NEED TO IMPOSE THE GUIDELINE SENTENCE TO PROTECT THE VICTIM.

Mr. McBride denies any implication that he abuses his daughter.  <u>See</u> PSR ¶ 31, at 10.  The admissions that Mr. McBride made during the Kansas polygraph examination, however, erode his contention.  <u>See</u> Sentencing Memo, Exhibit E, Kansas Bureau of Investigation Report (dated March 29, 2004).  Regardless of the truth of his situation, Mr. McBride offers his opinion that Summers should spend "[a]t least a year or two in jail."  PSR ¶ 31, at 10.  Thus, even Mr. McBride does not suggest that the ten-year sentence the PSR calculates is appropriate.

Summers, in actuality, did not place Mr. McBride's safety in any significant danger.  There is evidence that, although Summers discussed Mr. McBride's murder with the UC, the two did not make an agreement to kill Mr. McBride.  In contrast to many inchoate offenses to which the United States is a party, it was Summers' unwillingness to conclude a final agreement that prevented the scheme from developing through to fruition.

Therefore, despite the agents' caution in taking her threat seriously, Mr. McBride was not at imminent risk.  Moreover, it is speculative whether he would have been in any danger if Summers had been dealing with an individual who was willing to go forward with a plan to kill Mr. McBride.  Further, while it may seem that Mr. McBride's present custody of Lily could cause Summers distress similar to that she was experiencing when she committed the offense at issue in this case, the Court believes, considering Dr. Davidson-Stroh's conclusion that Summers is not an acute danger to herself or others, <u>see</u> Davidson-Stroh Letter, that Summers will not seek to harm Mr. McBride in the future.  In the end, the Court is convinced that Summers will not threaten Mr. McBride in the future.

### E.    THE COURT CAN, UNDER 18 U.S.C. § 3553(a), TAKE INTO ACCOUNT THE PROBLEMS WITH THE UNITED STATES' CASE.

A jury trial presents risks to the United States.  Although the sentencing represents a significant variance from the guideline sentence appearing in the PSR, the United States has exchanged a relatively lenient sentence for the certainty of conviction.  Given the mitigating circumstances of the offense, a jury's potential sympathy for Summers, and difficulties the United States might have establishing each element of the crime, the Plea Agreement represents a reasonable exchange.  See United States v. Jiang, 376 F. Supp. 2d 1153, 1157-58 (D.N.M.)(Browning, J.)(granting a variance after examining the potential benefits to the government and the public of going to trial); United States v. Stone, 374 F. Supp. 2d 983, 989 (D.N.M. 2005)(Browning, J.)(granting a variance after considering the government's prospects at trial).  The Court has an obligation to arrive at a just sentence; no sentence -- because of an acquittal -- would not be just in the circumstances of this case.

### 1.    A Jury Might Be So Sympathetic to Summers that it Acquits Her.

There are probably few allegations to which the public reacts with such a visceral, retributive instinct as sexual abuse of a child.  The circumstances of Summers' offense suggest a jury might be sympathetic to her plight and present an arguable case for acquittal.  The Plea Agreement acknowledges that the defense could prevail at trial because of juror empathy with Summers' situation.

Members of the Gallup community reacted in a sympathetic manner to Summers' story.  See Steele Letter at 1; Mezoff Letter at 1; Keptner Letter at 1.  Members of a jury might also feel a certain sympathy for her.  While seeking murder-for-hire to protect a child from further sex abuse

is obviously not justified under the law, many jurors may feel sympathy with Summers' predicament. This sympathy could make a jury more prone to consider an acquittal in this case than in a case involving § 1958 allegations arising from marital jealousy, or drug or gang warfare.

**2.      The Evidence of a Contract is Weak.**

The evidence is not clear that Summers formed a contract for the death of Mr. McBride, as her conviction under 18 U.S.C. § 1958 would require.  See 18 U.S.C. § 1958.  Although her conversations with the UC revolved around that prospect, a reasonable jury could conclude that there was never a meeting of the minds or an exchange of consideration.  That the parties did not consummate a contract may have been a function of Summers' reluctance.

There is evidence that, despite the UC's best efforts, he could not close the deal.  Summers' refusal to take that final, contractual step mitigates her actions.  The jury might ask itself how eager Summers was to have Mr. McBride murdered.

The United States, through the UC, consistently pushed the effort at a contract.  There is evidence that, although perhaps not rising to the level of entrapment, the UC pursued Summers more aggressively than she pursued the UC.

While the United States benefits from the certainty the plea provides, Summers, although foregoing the prospect of a not guilty verdict, also benefits by trading the risk trial entails for the certainty of a lenient sentence.  The exchange established in the Plea Agreement benefits both parties.  It secures a conviction for the United States and protects the public interest by maintaining Summers under supervision for three years.

-23-

### F.      SUMMERS IS NOT LIKELY TO RE-OFFEND.

The plea acknowledges that Summers acted from a desire to protect her granddaughter and is not a threat to re-offend.  While it may seem that Mr. McBride's present custody of Lily could cause Summers distress similar to that she was experiencing when she committed the offense at issue in this case, the Court believes, considering Dr. Davidson-Stroh's conclusion that Summers is not an acute danger to herself or others, <u>see</u> Davidson-Stroh Letter, that it is unlikely that she will re-offend, with a similar crime or with any other.

### G.      THIS SENTENCE DOES NOT CREATE A DISPARITY BETWEEN DEFENDANTS SIMILARLY SITUATED.

Distinct from most other federal murder-for-hire cases, this case invokes a certain amount of sympathy for the defendant.  Summers genuinely believed that Mr. McBride sexually abused her granddaughter.  Although Mr. McBride disputes the truth of the allegation, it is open to debate, and Summers believed that the evidence she reviewed undisputably convicted Mr. McBride.

For a sixty-three-year-old grandmother and school teacher with a life of law-abiding virtue to take such extreme measures, the stimulus must be extreme.  Unlike most other murder-for-hire cases, Summers sought resolution of her perceived grievance through appropriate legal channels.  Only after years of litigation, the results of which she believed demonstrated judicial indifference to her granddaughter's plight, did Summers resort to illegal means.  Summers' prolonged reliance on civil litigation distinguishes her from most others convicted of murder-for-hire schemes.[1]

**IT IS ORDERED** that the Defendant's objections are overruled and that her plea agreement,

---

[1] Given Summers educational background -- she holds a Ph.D. in education from Oklahoma State University, <u>see</u> PSR ¶ 65, at 17 -- and her personal history, the Court does not believe that 18 U.S.C. 3553(a)'s provision calling on sentencing courts to consider providing defendants with needed educational or vocational training, medical care, or other correctional treatment applicable.

as negotiated by the parties, accepted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Charles Barth
   Assistant United States Attorney
Albuquerque, New Mexico

      *Attorney for the Plaintiff*

Richard Winterbottom
Federal Public Defender
Albuquerque, New Mexico

      *Attorney for the Defendant*